**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


SCOTT P. MURDICK

      Plaintiff,

vs.                                                    CASE NO.: 8:05-cv-2172-T-17MAP

CATALINA MARKETING CORPORATION,

      Defendants.

_____/


**ORDER ON MOTION TO STRIKE AFFIDAVITS FILED IN OPPOSITION TO**
**MOTION FOR SUMMARY JUDGMENT, AND ON MOTION FOR SUMMARY**
**JUDGMENT**


      This cause comes before this Court on two motions-and-incorporated-memoranda-in-support filed by Defendants, Catalina Marketing Corporation ("Catalina") (Docket Nos. 9 and 17), and a memorandum-in-opposition then filed by Plaintiff, Scott P. Murdick ("Murdick") (Docket No. 15).  Defendants filed a Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law In Support (Docket. No. 9), to which Plaintiff in response filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Docket No. 15).  Defendants then filed a Motion to Strike Plaintiff's Affidavits Filed in Opposition to Motion for Summary Judgment (Docket No. 17), to which Plaintiff has not responded.  The following facts are taken as true for the purposes of resolving the issues raised by the pending motions.

## BACKGROUND

Defendant Catalina is a Corporation that provides targeted marketing services and programs for consumer packaged goods manufacturers, pharmaceutical manufacturers, marketers, and retailers. Catalina employs over 1,100 employees in the United States, Europe, and Japan. Catalina's Information Technology ("IT") department is responsible for all of Catalina's computer systems, including its primary revenue-generating services. William Geffert ("Geffert"), Vice President of Information Technology for Catalina, has overall responsibility for the IT department's operations, including discipline and discharge of its personnel. The department is divided into various work groups, each of which is headed by an Executive Director, who reports to Geffert. One such work group is "Enterprise Services," which is run by John Kuemmel ("Kuemmel"). Part of the Enterprise Services work group is the "server team," which is responsible for server operations, engineering, and support.

Plaintiff Murdick was a Senior Systems Engineer in the IT department for Catalina since his date of hire in November, 1998. He remained in that position until his date of discharge in June, 2005. In 2003 Catalina reorganized its IT department. As part of that restructuring, Catalina hired Brad Schulz ("Schulz") as a Systems Engineering Manager, and placed him in charge of the server and network teams. Schulz reported to Kuemmel, and supervised five employees on the server team. One of the employees Schulz supervised was Murdick, who was assigned to the server team in June, 2003.

Prior to 2003, Murdick would have had five annual performance reviews, and four had been presented for review. Catalina's reviews of Murdick generally consist of evaluations of how Murdick met objectives, and a summary of performance, among other things. If the objective was of critical importance, it was classified as a "1." If the objective was of high importance, it was classified as a "2." If the objective was of routine importance, it was classified as a "3." How Murdick performed with respect to each objective was rated on a scale of "1" to "5," with "1" being "far below expectations," "2" being "below expectations," "3" being "meets expectations," "4" being "exceed expectations," and "5" being "far exceeds expectations."

Consistent throughout Murdick's reviews up to and including his March, 2003 review, his last review that was not conducted by Schulz, is the theme that Murdick had

great technical ability, was very dependable, and was willing to work as necessary to complete tasks, but he was not always receptive to new ideas or criticism, could benefit from seeing the big picture, and could use improvement in his interpersonal skills.

On his March, 1999 review, of the nine objectives, six met expectations, two exceeded expectations, and one was below expectations.  The one that was marked below expectations was the only one of routine importance;  the remaining were considered of high or critical importance.  This review also contained a section for reviewing a total of twelve various personality characteristics.  Seven of those met expectations, two exceeded expectations, and three far exceeded expectations.  In summary, in twenty-one areas of review, he was below expectations in only one.  This is despite the fact that his interpersonal skills were clearly an area for improvement.  Finally, although in a different format from the other reviews, the summary section concludes that his performance was "Successful," which equates to exceeding expectations as it is the fourth of five possible ratings on this evaluation.

On the second review, in March of 2000, of four objectives for review, Murdick met expectations in one, exceeded expectations in two, and far exceeded expectations in one.  There was no mention of not meeting expectations, as his performance was deemed to exceed expectations in the summary area of the review.  There is no mention of any interpersonal issues as this review focused on Murdick's technical contribution to Catalina.

On his third review, in March of 2001, of three objectives for review, Murdick met expectations in one, and exceeded expectations in the other two.  His performance was deemed to exceed expectations in the summary area, although the review indicates a clear awareness of a lack of diplomacy in his communications with others.

Murdick's fourth review is absent, so it can not be considered.  Murdick's fifth and final review not conducted by Schulz, from March, 2003, has five objectives.  He met expectations in two, and exceeded expectations in the other three.  In the summary section his performance was deemed to exceed expectations, though there is mention of his lack of interpersonal skills.

In summary of the *available* pre-Schulz evaluations of Murdick, in thirty-three areas of evaluation, only once was Murdick's performance deemed to fall below

expectations (3%), and that area was only of routine importance.  He was deemed to meet expectations seventeen times (52%), exceed expectations eleven times (33%), and far exceed expectations four times (12%)  In the summary of performance sections, he was rated as exceeding expectations four of four times.  Since 97% of his individual ratings on these evaluations were at or above expectations, it can be inferred from these evaluations that he was deemed to be an asset to Catalina, in spite of his weaknesses.  (Of note is the fact that each evaluation was performed by a different supervisor, and one evaluation is inexplicably missing.  Also of note is the fact that in his fifth review, conducted by John Kuemmel, his performance was deemed to exceed expectations despite his weaknesses.  John Kuemmel later participated in the decision to dismiss Murdick based on Schulz's negative evaluations.)

Three months after his fifth review, in June, 2003, Murdick was assigned to work for Schulz as part of the server team.  In August, 2003, Murdick and Schulz took a business trip together to Tokyo, Japan.  On that trip, Murdick alleges that he and Schulz were at dinner on the first night, when Schulz began a conversation about the Bible, to which Murdick responded that he was a Buddhist.  He alleges that he did this to correct Schulz's assumption that he was a Catholic, and to inform Schulz that he was a Buddhist, in anticipation of a planned trip to Canon's temple, a Buddhist temple.  He alleges that discussion ended with that comment.  Murdick further alleges that on one occasion when he and Schulz were leaving their place of work they had a conversation about a Harry Potter book.  During this conversation Murdick alleges that Schulz said the Harry Potter book was "devil worship," and was "evil" because it involves a witch.  Murdick alleges that he responded by saying that was "not right."  He further alleges that he told Schulz that he was a Buddhist, and asked Schulz if he (Murdick) and all Buddhists were evil, to which Schulz allegedly said "yes," [they were all evil].

Schulz claims that he was not aware that Murdick claimed Buddhism as his religion.  He states that on a plane ride to Japan for business, Murdick offered to let him read his Harry Potter book.  Schulz says he declined because he was not interested in Harry Potter books because of their sorcery content.  He says that after Murdick pressed the issue, Schulz told him that the bible refers to sorcery as "evil."  He denies having said that Buddhists were evil, or that Harry Potter is devil worship.  He also states that he and

Murdick visited Buddhist temples, but that Murdick did not mention that they were significant to him in any way.  He says that the first time he became aware of Murdick being a Buddhist was when Murdick filed an Equal Employment Opportunity Commission ("EEOC") complaint in August, 2005.  To counter this claim by Schulz, Murdick provides pictures taken at the Buddhist temple, during which he participated in some Buddhist rituals, all within view of Schulz.  Alleging that as such, Schulz could not have been unaware of Murdick's participation in the rituals.  These rituals included pulling smoke from burning prayer scrolls, and sitting in a half-lotus position.  He further alleges that he explained the significance of these actions to Schulz, and told Schulz he was a Buddhist both before and after the visit to the temple.

Starting in December, 2003, four months after the time when Murdick alleges Schulz learned of his Buddhism, Catalina documents a series of incidents that it claims demonstrate that Murdick's performance as an employee was below expectations.  The last of these events was in the spring of 2005.  The first incident, in December of 2003, involved a "coaching session" in which Schulz counseled Murdick to have a "more receptive attitude with team members" and provide "support for the new 'on-call' policy."  Murdick responds that he was resistant to the new "on-call" policy, a policy which Schulz initiated, because everyone was resistant, and Schulz was unhappy that Murdick had expressed misgivings about a plan Schulz himself had initiated.  In the second incident, in March of 2004, Schulz counseled Murdick for job performance and interpersonal skills issues.  Murdick does not remember this incident.  The third incident, again in March of 2004, concerned excessive absences (ten full days and three partial days during the month of February) from work.  Murdick contends that this time was time that he had accrued and had a right to use, and that the meeting was not a counseling session as framed by Schulz, but a meeting that he called to discuss his future attendance in light of his pending divorce.  The fourth incident, in April of 2004, was regarding an email that Schulz felt was less productive than helpful.  Murdick does not recall this meeting.  The fifth, in April of 2004, simply notes the results of Schulz's first evaluation of Murdick.  The sixth, in July of 2004, involved another inappropriate email.  The seventh, in November of 2004, involved yet another email that created a stir, in part because Schulz alleged that Murdick did not follow up on an assignment.  Murdick

replied in that email that between getting a divorce, and moving, he was not sure "how he could have missed" the detail.

Schulz notes that during this time he had recognized that Murdick was going through a divorce and needed time to handle his personal affairs, so he had reduced Murdick's workload to allow him to do so, in contrast to Murdick's allegation that he had actually increased his workload. The eighth, in Spring of 2005, concerned Murdick's alleged lack of follow up on an assignment. Murdick provided a copy of email correspondence regarding this incident to dispute the claim. Though the email demonstrates a lack of interpersonal skills, it indicates that at least initially, Schulz did not follow up with the request. Murdick alleges that he spoke to Schulz personally, after emailing Schulz that he was "crazy" for asking him to implement the request. He claims that he and Schulz decided that Schulz was to follow up on the request, so he did not pursue it, while the emails submitted indicated that Schulz thought Murdick was to follow up. Murdick supplied emails regarding two other situations demonstrating discontent with Schulz for a lack of assistance, and for being asked to follow company procedures for recording work time.

Schulz also completed two performance reviews of Murdick. The first review (Murdick's sixth review since being hired) was completed in March, 2004, approximately seven months after Murdick alleges Schulz learned Murdick was a Buddhist. It contained a list of fifteen objectives. Murdick's performance was rated as below expectations four times (27%), meets expectations ten times (67%), and exceeds expectations once (6%). Two of the below expectations were critical items, one was high priority, and the other was of routine importance. This is a marked departure downward from the average of his prior evaluations, where 3% of objectives were below expectation, to where 27% were below expectations. In the summary section, his performance was rated as meeting expectations, and consistent with prior evaluations, his technical ability and loyalty were lauded, while his interpersonal skills were seen as a weakness.

Murdick's second review by Schulz (his seventh overall) continued this downhill trend. This review contained twelve objectives. His performance was rated as meets expectations four times (33%), below expectations seven times (59%), and far below

expectations one time (8%).   In the summary section, his performance was rated as below expectations, and Schulz commented that although Murdick worked very hard, he had frequently not met the high expectations of his position.  (Of note is that Murdick has maintained the same title since he was hired in 1998.)  Schulz further notes that Murdick's attitude seems to be the main characteristic holding him back, for which he had developed a poor reputation.  This is again a marked departure down from his prior review, and a drastic downturn when compared to his reviews before Schulz conducted them.  In this review, his performance was considered below expectations 67% of the time, as compared to 27% in the prior review by Schulz, and further compared to 3% total for the four prior non-Schulz reviews.  In the summary section Murdick's performance rating was, for the first time, below expectations, as compared to being rated at "meets expectations" in Schulz's first review of him, and a consensus rating of "exceeds expectations" on four of the four available reviews pre-Schulz.  Clearly something changed.

As a result of these occurrences, and Schulz's first annual performance evaluation of Murdick, Catalina placed Murdick on a Performance Improvement Program ("PIP") in April, 2005.  (The second performance review was conducted during or close to the first progress check meeting after the PIP had been implemented.)  The PIP placed Murdick on probation for ninety days (till approximately mid-July, 2005), and contained a list of observations about Murdick's job performance shortcomings, and an itemized list of "action items" that Murdick was to accomplish during the probationary period, with individual due dates.  Schulz created the PIP, including all the assignments, and it was reviewed and approved by Kuemmel, Geffert, and David Ferrell from Human Resources.  They allege that the actions were reasonable, and could have been completed by the expected dates.  Schulz scheduled five semi-weekly meetings with Murdick, so Schulz could check on Murdick's progress on the PIP.  These were set for April 28, May 13, May 27, June 10, and June 24, 2005.  If Murdick completed the action items satisfactorily, he would likely be allowed to retain his employment; if he did not, his employment would likely be terminated.

The list of job performance failings in the PIP contained five observations by Schulz about the poor quality of Murdick's performance, including both job performance

and interpersonal skills failings.  The fifth observation included a commendably exhaustive list of twenty-six duties delineated in his job description, which Schulz said Murdick had not been completing.  The action plan listed nine projects that he was responsible for completing, and a notation that in addition to these assignments, he was still responsible for daily production support when completing the nine items.  The itemized list of items that Murdick was responsible for completing in ninety days is over five pages long, mostly single spaced, using small type, in paragraph form.

At the first semi-weekly meeting (April 28, 2005), Catalina states that only two of the seven items due to be completed had actually been completed.  Schulz sent a memo about this meeting to Kuemmel, Geffert, and Human Resources, noting that Murdick "remained very argumentative and unwilling to accept the feedback and opportunity to improve that was being provided."  (Dkt. No 15, Exhibit E, p 15).  Catalina states that Murdick missed the next two meetings (May 13 and May 27, 2005).  A meeting was scheduled for May 31, 2005, during which Schulz noted that only three of fourteen action items due had actually been completed.  Schulz also noted that Murdick was absent nine days, and that he had left early three days, since the prior progress meeting on April 28, 2004.  On June 3, 2005, after "consultations with, recommendations from and concurrence by Kuemmel, Schulz and Human Resources", Vice President Geffert released Murdick because he was "unable to meet job requirements."

Murdick believes that he was discriminated against because he was a Buddhist. Murdick claims that his workload was increased to the point where it substantially exceeded the workload of others; his work was retroactively downgraded to make it look as though Murdick did not perform his job; work was assigned to him in such a manner as to make it impossible to complete on time; much of the work assigned to him was beyond the scope of his job description; he was accused of lying; and his work was sabotaged; he was treated disparately (he was assigned tasks that required training that he did not receive, but other employees had) and he continued to be harassed due to his religious beliefs; and finally, Murdick's employment was terminated, all because he was a Buddhist.  Murdick further claims that he asked for a transfer to another department, and the supervisor of that group wanted Murdick to join his group, but that transfer was denied.

Murdick filed a charge of religious discrimination with the EEOC in August, 2005, based on his belief that he had been discriminated against. The EEOC investigation resulted in a "no cause" finding. In November, 2005, Murdick filed an action in the Circuit Court of the Sixth Judicial Circuit In and For Pinellas County, Florida, for Violation of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01-760.11 (2001), and for Violation of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000A, et seq. Catalina filed a Notice of Removal under the provisions of 28 U.S.C. §§ 1331, 1441, and 1446, to remove the action to the United States District Court of Florida, Tampa Division, and the case has been removed to this Court.

Catalina has filed a Dispositive Motion for Summary Judgment, to which Murdick filed a Memorandum of Law in Opposition, complete with two additional, supporting affidavits. One affidavit was written by Murdick himself, in support of his claim that Schulz was aware that he was a Buddhist, and includes supporting photographs. The other affidavit was written by Lionel Moussonne, a former employee of Catalina in Paris, in support of Murdick's contention that the list of action items included in the PIP was unreasonable. Neither affidavit was disclosed to Catalina prior to the Memorandum of Law in Opposition to the Motion for Summary Judgment. Catalina thus filed a Motion to Strike the two Affidavits that were included with the Memorandum Filed in Opposition to Motion for Summary Judgment.

## MOTION TO STRIKE AFFIDAVITS

### Standard of Review

The Federal Rules of Civil Procedure, Rules 26 and 37 for the instant case, govern motions to strike affidavits. Rule 26 governs disclosure requirements. Fed.R.Civ.P. 26. Rule 26(a)(1) requires parties to provide disclosure to other parties, without waiting for a request. *Id*. Rule 26(a)(1)(A) in relevant part requires parties to disclose identifying information of individuals that a party may use to support its claims or defenses, unless solely for impeachment. *Id*. Rule 26(a)(1)(B) in relevant part requires parties to disclose a copy of documents in its possession, custody, or control, to be used to support its claims or defenses, unless solely for impeachment. *Id*. Rule 26(e) in relevant

part imposes a duty on parties to continue to disclose as well as correct, amend, or supplemented prior disclosures as necessary, to remain in compliance with Rule 26(a). *Id*. Rule 37(c) governs sanctions available for failing to comply with Rule 26. Fed.R.Civ.P. 37(c). It provides, in relevant part, that unless there is substantial justification, or the failure to disclose is harmless, the evidence not disclosed is not to be used at trial, at a hearing, or on a motion. *Id*. It authorizes the court to, on motion from the offending party, impose other appropriate sanction in lieu of striking the evidence. *Id*. If the material is supplied for impeachment purposes only, there is no Rule 26 violation, thus Rule 37(c) is not applicable. If there is a Rule 37(c) violation alleged, the "party failing to comply with Rule 26 bears the burden of showing that its actions were substantially justified or harmless." *Weaver v. Lexington Insurance Co.*, Slip Copy, 2007 WL 1288759, (M.D. Fla. 2007).

Regarding these affidavits, the court must first determine if they are submitted for impeachment, or for other purposes. It must then determine if Murdick had "substantial justification" for not disclosing them, or if the failure to disclose was harmless to Catalina. Finally, the Court needs to determine whether an unsworn statement can be considered at all.

**Discussion**

Murdick submitted several attachments with his Memorandum of Law in Opposition to Motion for Summary Judgment, but only Exhibits "O" and "P" are the subject of the motion to strike. Exhibit "O" is an affidavit written by Murdick. Contained in this affidavit are six photographs, labeled Exhibits "A" through "F." Murdick states that these pictures, which were taken with his camera in August of 2003, are of him and Schulz at the Kannon Temple in Tokyo, a Buddhist Temple. Exhibit "C" of Exhibit "O" shows Murdick "pulling smoke" from burning prayer scrolls, a Buddhist ritual, while Schulz is standing next to him. Exhibit "D" of Exhibit "O" shows Murdick washing his hands in the Temple fountain, and Exhibit "F" of Exhibit "O" shows Murdick sitting in a half lotus position, both of which are Buddhist rituals, and Schulz is present for both. Murdick further states in this affidavit that he told Schulz what this

meant to Murdick as a Buddhist.  He submits this to support his claim that Schulz could not have been unaware that he was a Buddhist.

Exhibit "P" submitted with the memorandum is a statement to support Murdick's allegation that the list of action items in the PIP was unreasonable, and that the PIP itself was not typical for Catalina.  The statement was written by Lionel Moussonne ("Moussonne").  Moussonne is a former employee of Catalina's Paris office, who worked as a System and Network Manager from July 2004, until May, 2006.  Moussonne worked with Murdick during the time Murdick worked for Schulz.  In this Statement, Moussonne, states that he worked with Murdick, observed that Murdick was easy to work with, that the PIP Murdick received was not normal Catalina procedure, and that in his opinion, as someone familiar with Catalina as well as the technical requirements of the action items, the action items in the PIP were unrealistic.  This statement, dated November 13, 2006, is in the style of a traditional affidavit, is signed by Moussonne, and the section with the words "SWORN AND SUBSCRIBED TO ME before this ____ day of _____, 200_" has the date filled in, but the form does not have Notary Public information, or a seal.

Catalina filed a motion to strike the pictures in Exhibit "O," Moussonne's statement labeled, and Moussonne himself as a witness, based on Fed.R.Civ.P.26. Catalina claims that Rule 26(b) mandates that a party produce a copy of all documents in a party's care, custody, or control, that a party may use to support its claims or defenses, which includes the pictures in Exhibit "O," and Moussonne's statement.  Catalina also states that R26(a) mandates that a party disclose the identities of individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses," which would include Moussonne.  Catalina also notes that Fed.R.Civ.P. (26)(e)(1) requires Murdick to supplement prior disclosures and responses, and that these documents and this wintess' identity would fall under that rule as well, but that this was not done.  Catalina simply states that Fed.R.Civ.P. 37(c)(1) provides that such undisclosed material should not be permitted to be used at trial at all.

Fed.R.Civ.P. 26(a)(1) has a further provision regarding discovery.  It provides that  discovery is required, without request, of the identity and of relevant documents etc, "unless solely for impeachment."  Further, Fed.R.Civ.P. 37(c)(1) states that a party that

*without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1), is not, unless such failure is harmless, permitted to use the evidence a trial.

Regarding the pictures, it is clear that they were in Murdick's care, custody, or control because he states that they came from his camera, and were taken during his trip to Japan.  Therefore, the Court must first determine if Murdick submitted them "solely for impeachment."  If so, then they won't be stricken as disclosure was not required.  If they were not submitted "solely for impeachment," then the court must determine if there was "substantial justification" for not disclosing them.  If there was, they will not be stricken.  If there was not, then the Court must determine if the failure to disclose was "harmless."  If found to be harmless, then they will not be stricken, otherwise they will be stricken, or on motion by Murdick, other sanction may be imposed.  Regarding Moussonne's statement, the Court must follow the same path as for the pictures, and then it must determine if a statement that has not been notarized can be considered.

Murdick states repeatedly in his Memorandum in Opposition to the Motion for Summary Judgment that the pictures were submitted to impeach Schulz's testimony.  It is not clear the pictures were submitted with the *sole* intent of impeaching Schulz, or if Murdick intends to use them for other purposes as well.  If Murdick intends to use them solely for impeachment, the analysis ends and they can be used for impeachment purposes only.  If, however, Murdick intends to use the pictures for other purposes, that would only be permitted if there was substantial justification for failing to disclose, or if the failure to disclose was harmless to Catalina.

Catalina states that it was harmed in that it relied on the disclosures in preparing its motion for summary judgment.  It is hard to imagine that Catalina would have done nothing different had it been made aware of the existence of pictures which strongly support Murdick's claim.  Without the pictures, the only evidence presented that Schulz was aware that Murdick was a Buddhist is Murdick's word.  With the pictures, which are compelling, Schulz is essentially in a position where he has to disprove knowledge that seems obvious from the pictures.  This shifts the balance to Murdick, and Catalina had no chance to prepare a response.  Therefore, failure to disclose would not likely be considered harmless to Catalina, leaving only a "substantial justification" approach available to Murdick.

However, Murdick has not responded in opposition to Catalina's Motion to Strike the pictures. Therefore the court is unaware whether Murdick has other intentions for the pictures, and if so, if there is substantial justification for failing to disclose. "A party failing to comply with Rule 26 bears the burden of showing that its actions were substantially justified or harmless." *Weaver v. Lexington Insurance Co.*, Slip Copy, 2007 WL 1288759, (M.D. Fla. 2007). Murdick has not met the burden necessary in order for him to use the pictures for purposes other than impeachment, if that is even his intention. Defendant's Motion to Strike plaintiff's photographs included in Exhibit "O" is **DENIED**, without prejudice. However, plaintiff is permitted to use the photographs for impeachment purposes, especially in consideration of the motion for summary judgment. If plaintiff intends other uses at trial, Catalina can reassert its motion to strike the pictures, at which point Murdick will need to demonstrate that it had substantial justification under Rule 37 for not disclosing them to Catalina as required by Rule 26. If Murdick chooses to do so and demonstrates substantial justification for not disclosing, the Court will not strike the pictures. If Murdick does not demonstrate substantial justification, the Court will determine if the pictures will be stricken, or, on motion by Murdick, if other forms of sanction will be imposed instead.

Regarding the statement of Moussonne, Murdick does not state that it is to be used for impeachment purposes. Murdick does say that a jury will be more likely to believe him given that Schulz's testimony has been impeached, in light of Moussonne's statement. Since Moussonne's statement was not submitted for impeachment purposes, it must be stricken unless there was substantial justification for not disclosing it, or if failure to disclose was harmless to Catalina. Again, it is hard to imagine that Catalina would have done nothing different had it been made aware of Murdick's attack on the reasonableness of the PIP. Without this statement, the only evidence that the PIP is unreasonable, other than the substantial nature of the PIP itself, is that Murdick says it is unreasonable, where Catalina has several members of management who state it is reasonable. Exhibit "P" shifts the balance toward Murdick, and Catalina had no chance to prepare a response. Therefore, this failure to disclose would not likely be considered harmless to Catalina, leaving only a "substantial justification" approach. However, Murdick has not responded in opposition to Catalina's motion to strike the statement.

Therefore, the Court has no idea whether Murdick proposes any substantial justification for its failure to disclose.  The Court does, despite Murdick's lack of response, determine that there could have substantial justification for failing to disclose this statement, based on the motions.

In its motion to strike, Catalina notes that in January, 2006, this Court's Case Management and Scheduling Order set the discovery cutoff for September 15, 2006. Catalina's last formal request for production of documents was in June, 2006, (although it is worth noting that Rule 26 requires compliance without waiting for a discovery request.)  Moussonne's statement says that he was employed by Catalina until May, 2006.  It is unlikely that Moussonne would have testified as a witness against Catalina, and, therefore, someone that Murdick "may use" as a witness, while he was employed by Catalina.  He left their employ in May, just before Catalina's last formal request for production in June.  This leaves as much as six months where Murdick could have been aware that Moussonne would have been a witness but did not disclose that to Catalina. However, the statement itself is dated November 13, 2006, which further suggests that this was indeed a last minute witness for Murdick.  Assuming these facts to be the case, not knowing an individual can be used as a witness could be substantial justification for not disclosing to the other party that individual will be used as a witness.  However, due to a lack of response from Murdick, the Court cannot be sure if this is the case, and would grant the motion to strike the statement, or on motion from Murdick, consider other sanctions, on this point alone.

The last point, however, is whether an unsworn statement can be considered by the Court.  "…unsworn statements, even from pro se parties, should not be 'consider[ed] in determining the propriety of summary judgment.'"  *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir.1980).  "Federal law does provide an alternative to making a sworn statement, but requires that the statement include a handwritten averment, signed and dated, that the statement is true under the penalties of perjury."  *Id*. citing 28 U.S.C. § 1746.  Moussonne's statement is unsworn, and does not include the proper averment. Therefore, Defendant's Motion to Strike exhibit "P" is **GRANTED**.

<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**Standard of Review**

Summary Judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's determination that no genuine issue of material fact exists shall be based on the totality of the evidence presented in the "pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits submitted." *Id*. A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986). There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party ..." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must go beyond the pleadings to show that a genuine issue exists for trial. *Id*. The non-moving party must come forward with evidence sufficient to establish the existence of the essential elements of its case, which the non-moving party will have the burden to prove at trial. *Id*. The evidence presented must be construed in favor of the non-moving party, and that party must receive the benefit of all favorable inferences that can be drawn from that party's evidence. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249.

**Discussion**

Murdick asserts an employment discrimination claim based on religion under Title VII of the Federal Civil Rights Act of 1964 ("Title VII"), as well as a claim under the Florida Civil Rights Act of 1992 ("FCRA"). Claims under the Florida Civil Rights Act (FCRA) are analyzed under the same framework and standards as the Title VII

claims. *Reis v. Universal City Development Partners, LTD.*, 442 F .Supp.2d. 1238, 1252 (M.D.Fla.2006) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278,1287 (11th Cir.1997));  *Speedway Superamerica, LLC*, 933 So.2d 75, 102 (5th DCA 2006) (Florida Supreme Court has long recognized that Title VII was the model for FCRA) (citing *Byrd v. Richardson-Greenshields Secur., Inc.*, 552 So.2d 1099, 1102 (Fla.1989)).  Therefore, the Court will analyze the motion under the Title VII claim, and the decision of the Court regarding the Title VII action will apply to the FCRA claim as well.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discrimination on the basis of, inter alia, religion. *Gunning v. Runyun*, 3 F.Supp.2d 1423, 1428 (S.D.Fla. 1998).  Pursuant to 42 U.S.C. § 2000e-2(a):  It shall be an unlawful employment practice for an employer-

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's ... religion; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion..

"Religious discrimination claims under Title VII are analyzed under two legal theories: 'disparate treatment' and/or 'failure to accommodate.'"  *Id*. at 1427.  The instant case appears to have been brought under the disparate treatment theory.  To prevail under a Title VII theory of disparate treatment, Plaintiff must show that he is, or was, treated less favorably than other employees because of his religious beliefs.  *Id*.

There are three way to establish a prima facie case of disparate treatment discrimination under Title VII.  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). A plaintiff may use: 1) statistical proof of a pattern of discrimination, 2) direct evidence which, if believed, would prove the existence of discrimination without inference, or 3) the burden shifting framework established in *McDonald Douglas Corp. v. Green.  Id*.

Catalina contends there is no direct evidence, and, therefore, a direct evidence approach should not be followed.  Murdick claims that the statement made by Schulz, for

example, that Murdick was evil because he was a Buddhist, constitutes direct evidence. An example of direct evidence would be: "I am firing you because you're Christian." *Richardson v. Dougherty County, GA*., 185 Fed. Appx. 785 (11th Cir. 2006).  This constitutes direct evidence because the statement alone, without inference or presumption, proves that the employer took adverse action on the basis of religion.  *Id*. Examples of minor statements not considered direct evidence include "preacher man," and "too preachy."  *Id*.  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  *Id*.  "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence."  *Id*.  Murdick's statements, if true, clearly prove that he considered Buddhists evil, but standing alone they do not prove that he would take adverse action based on his negative feelings.  They might suggest that he would given the context in which they were said, but the requirement of knowing the context, i.e. inferring the true meaning, makes them circumstantial evidence, not direct evidence.  Therefore, a direct evidence approach is not applicable to the instant case, the more typical burden shift approach is applicable.

In *McDonnell Douglas Corp. v. Green*, the United States Supreme Court established the basic process and the allocation of burdens among the parties in Title VII employment discrimination cases.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Initially, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination.  *Id*. at 802.  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id*.  The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*.  The defendant's burden is merely one of production and is met "if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  If the defendant proffers a non-discriminatory reason for its action against the plaintiff, the presumption of discrimination is eliminated and the burden shifts again to the plaintiff to provide admissible evidence sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were pretext. *Id*. at 255-56.

*Prima Facie Case*

A "plaintiff establishes a *prima facie* case of disparate treatment discrimination if he can show, through direct or indirect evidence, that: (1) he is a member of or practices a particular religion; (2) he is qualified to perform the job at issue; (3) he has suffered some adverse employment action; and (4) someone outside the protected class of which he is a member was treated differently."  *Gunning,* 3 F.Supp.2d at 1427.

<u>Is Murdick a Buddhist?</u>

Regarding the first element, Murdick claims to be a Buddhist, and a practicing Buddhist, but not a strictly practicing Buddhist.  Catalina attacks Murdick's Buddhism, first by saying Murdick's beliefs are simply his preferred "philosophy/lifestyle," and personal philosophies/lifestyles are not protected under Title VII.  In support of its attack, Catalina takes these words from Murdick's own deposition, where he says "It's just a philosophy for me." Murdick 262.  Catalina also notes that Murdick does not observe Buddhist rituals or ceremonies.  Catalina properly supported its motion for summary judgment on this first point under element one.

Murdick offers evidence beyond the pleading to show that there is a genuine issue of material fact about whether his Buddhist beliefs satisfy the first element on this first point.  Murdick offers that the test for determining what is religion within the meaning of 42 USC § 2000e is whether an employee's sincere and meaningful beliefs occupy in the employee's life a place parallel to that filled by the tradition of God.  EEOC Dec No. 71-779 (1970).  Murdick further cites the same source Catalina cites, www.wikipedia.com, to describe Buddhism.  The Wikipedia website, which both Murdick and Catalina have apparently agreed is an acceptable source for these purposes, states that Buddhism is a "non-theistic religion, a way of life, a practical philosophy, and arguably a form of psychology."  These words are remarkably similar to Murdick's words when describing his Buddhist beliefs.  Murdick said he does meditate nearly every morning as a ritual.  He stated that he might pursue Buddhism more if there were Eastern monks to learn from, but there are none in the Tampa area.  He also stated that were he to practice Buddhism strictly, he would be a monk, which he is not, and that his role model is the Dalai Llama.  When asked if he believe in God, Murdick replied that he did, but not like most people.

That, together with his statement that he has to correct people who assume he is a Christian by telling them he is a Buddhist, and that he has claimed Buddhism since he was eighteen years old, can clearly be seen to imply that he holds religious belief, and that belief is Buddhism.

This Court finds that Murdick has provided evidence and established that there is a genuine issue of material fact on this first point within element one, such that it should survive summary judgment.

Catalina second attack under the first element attacks Murdick's Buddhism by stating that even if his beliefs constitute protected religious beliefs, as opposed to unprotected secular beliefs, in Murdick's case his religious beliefs are not sincere, i.e. "truly held," because his actions are inconsistent with the behavior expected of practicing Buddhists.  In order for a religious belief to be protected, it must be truly held.  *United States v. Seeger*, 380 U.S. 163, 185 (1965).  Catalina asserts that the "consistency with which the plaintiff acts on his beliefs is a critical factor in determining whether they are truly held."  Catalina cites *Hussein v. The Waldorf Astoria*, 134 F.Supp.2d 591, 596-597 (S.D.N.Y. 2001) in support of that assertion.  Catalina then presents information about Buddhist teachings, including the Fifth Precept, which holds that Buddhists should "refrain from intoxicants which lead to heedlessness."   Catalina then gives examples of Murdick's behavior that is inconsistent with the teachings of Buddhism, including his drinking alcohol to the point of heedlessness, and apparent pride in doing so repeatedly, as well as his use of profanity on his web log, where he also insults women and law enforcement officers.

Murdick offers discussion beyond the pleading to show that there is a genuine issue of material fact about whether his Buddhist beliefs satisfy the first element on this second point.  Murdick first notes that he claims to be a Buddhist, not inhuman.  Murdick notes that religions do not expect perfection by giving examples of those in other religions who do not adhere to their religious tenets, yet retain their religion. For example, a person who strictly practices Judaism, but occasionally breaks kosher, is still considered Jewish, despite the failing.  Although Murdick has submitted no compelling evidence regarding whether drinking alcohol to heedlessness repeatedly automatically removes Buddhism as a religion that Murdick can claim, the Court recognizes the

legitimacy of the argument, and goes further by stating that Murdick need not submit such evidence on this point.

Catalina has cited *The Waldorf Astoria* to support its contention that acts inconsistent with a religion are a way to determine if a religion is sincerely held. *The Waldorf Astoria*, 134 F.Supp.2d at 596. In *The Waldorf Astoria*, the plaintiff brought, et. alia, a Title VII suit because his employer failed to accommodate him by not letting him serve as a banquet waiter when he showed up to work with a beard that violated the company's policy. *Id*. The plaintiff claimed that his religion required him to wear a beard. *Id*. The court found that he did not have a bona fide religious belief, not because his actions were inconsistent with those that his religion required, but because his actions were inconsistent with his own prior actions, as well as his subsequent actions, suggesting a lack of conviction to the claimed religion. *Id*. This is different from Catalina's interpretation of *The Waldorf Astoria*, and renders Catalina's interpretation inapplicable to this case, since there is no allegation that Murdick's actions were inconsistent with his own prior or subsequent actions. Catalina, therefore, did not properly support its motion for summary judgment on this point, which effectively equates to this point not having been addressed in the motion for summary judgment, meaning Murdick had no burden to oppose it. The motion for summary judgment itself on this second point under element one fails.

The Court finds that Murdick has survived the motion for summary judgment under the first point of contention under element one, and the motion for summary judgment under the second point of contention under element one was insufficient. Therefore, the Court finds that element one of the *prima facie* case survives the motion for summary judgment.

Is Murdick Qualified to Perform the Job at Issue?

Catalina does not directly address the second element, whether Murdick was qualified to perform the job at issue. Since this element is not attacked, it need not be addressed by Catalina. However, Murdick has offered evidence showing that he was qualified for the position, such as his title of Senior Systems Engineer, and four years of reviews that all show he exceeded expectations in that position. Therefore, element two remains for a trier of fact to determine.

Has Murdick Suffered an Adverse Employment Action?

Catalina attacks the third element on three grounds.  Catalina first claims that in order for an action for religious discrimination to be sustained, the person who took the adverse action had to have knowledge of the faith, and, second, the person must have acted based on the faith.  Catalina cites *Lubetsky v. Applied Card Systems, Inc*. for this. *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301 (11th Cir. 2002).  Therefore, Catalina claims, since it was Geffert that actually fired Murdick, and Geffert claims not to have known that Murdick was a Buddhist, the action must fail for lack of intent by the adverse decision-maker.  Third, Catalina states that the only adverse employment action that Murdick can claim under this Title VII action is his discharge; criticism, counseling, negative evaluations and placement on performance improvement plans etc. do not constitute "adverse employment actions" under Title VII.

It is undisputed that Geffert made the final decision to terminate Murdick.  It is also undisputed that Geffert based his decision on observations by others, including Murdick's performance reviews and prior reviews, and consultations with Schulz, Kuemmel, and Hulsey.  It is also likely that Kuemmel and Hulsey based their agreement with the decision to terminate on Schulz's observations of Murdick, particularly since Kuemmel's own pre-Schulz review of Murdick resulted in an "exceeds expectations" rating.  In his deposition, Geffert states that he was aware that Schulz was attempting to address Murdick's job performance and attitude issues.  He states that he and Schulz consulted about whether to put Murdick on a PIP, and he *agreed* with Schulz that a PIP was appropriate.  Geffert's decision to terminate Murdick was based on consultation with Schulz, Kuemmel, and Hulsey.  Kuemmel and Hulsey's agreement seem to be based on prior consultations with Schulz, which means that the decision was primarily justified by Schulz's actions.  It is unclear if Schulz decided to address Murdick's job performance and attitude issues himself, or if he was directed to address them, but it is clear that Geffert's decision was nonetheless based on the actions that Schulz took, including the documentation of Murdick's performance, placement on the PIP, and by inference, possible recommendation to Geffert to terminate Murdick.

Referring to *Lubetsky,* Catalina would place no importance on the fact that Geffert's decision to terminate Murdick was based on Schulz's actions, and would see

the discrimination claim fail because Geffert was undisputedly unaware that Murdick was a Buddhist.  In *Lubetsky*, the court granted a motion for summary judgment when postal employees claimed Title VII religious discrimination because the Post Office would not permit them to play Christian music at work.  The *Lubetsky* court had to analyze the claim under both a disparate treatment analysis, and a failure to accommodate analysis. The court found that under the second element of the failure to accommodate analysis, where the party must have informed his employer of his religious belief, that the employees had not done so, and, thus, the court granted the motion.  The instant case is not a failure to accommodate case, but a disparate treatment case, and the conclusion that the adverse decision maker must be aware of the faith is an inaccurate assessment of the holding of *Lubetsky* as applied to this case, and, therefore, is not applicable here.

The Court finds that Catalina has not properly supported its motion for summary judgment on the point that the adverse decision maker must be aware of the faith, and, therefore, Murdick has no burden to prove that Geffert was aware of Murdick's faith, which he did not do.  Murdick nonetheless demonstrates that Geffert did not need to be aware of Murdick's Buddhism for Murdick to sustain an action.

Murdick cites *Quinn v. Monroe County* in support of the proposition that Catalina can be held liable even if Geffert did not know Murdick claimed Buddhist as his faith. *Quinn v. Monroe County*, 330 F.3d 1320 (11th Cir. 2003) citing *Hitt v. Connell*, 301 F.3d 240, 247-249 (5th Cir. 2002).  *Quinn* and *Hitt* concern government entity liability.  Per *Quinn*, a decision-maker in the public entity context is someone who can expose himself to liability, but not the government entity, while a policy-maker is a person or entity (such as a governing board)  that can expose the public entity itself to liability.  *Id*.at 1325.  This distinction is necessary because governmental entities cannot be held liable under 14 U.S.C. § 1983 on a theory of respondeat superior.  *Id*.  Rather, they may be held liable on for the execution of a governmental policy or custom.  *Id*.  "Municipal liability may arise with regards to an employment decision, such as a termination, provided that the decision-maker 'possesses final authority to establish municipal policy with respect to the action ordered.'"  *Id*.  In other words, there may be liability if the decision-maker is the policy-maker.  *Id*.

However, *Quinn* states that "an official or formal decision-maker may often be identified by a rule, e.g., an employee handbook or organizational chart, or in the case of public entity employers, by examining the statutory authority of the official alleged to have made the decision." *Id*. The structure of this sentence, where it discusses how to find the formal decision-maker and notes a special circumstance for public entities, makes it clear that non-government entities such as Catalina can be included in a similar analysis. *Id*. An example of a decision-maker is the person who makes a decision, in the case where no further action is required in order for that action to take permanent effect. *Id*. For example, if Geffert's decision to terminate Murdick's employment was subject to mandatory review, then he would not have been the decision-maker, but if his decision was subject to no review, or review only at the election of Murdick, then he is the final decision-maker. *Id*. In the instant case, Geffert is the true decision-maker.

Murdick argues that a decision based on faith does not require that the actual decision maker be aware of the faith, but that originally, the decision to take adverse action had to have been based on the faith. In other words, there only needs to be a causal connection. Murdick cites the Eleventh Circuit in *Quinn*:

> In most "causal connection" cases, the determinative question is whether the discriminatory or retaliatory motive of a subordinate employee may be imputed to the titular decision-maker. A decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely "rubber-stamps" the recommendation of a subordinate.

*Id*. at 1327. Thus, were Catalina a government entity that was not liable under respondeat superior, it could still be liable if Geffert were the decision-maker and policy-maker, which is indeed his analogous position, if he simply "rubber-stamped" a subordinate's recommendation. If Catalina could be held liable in a situation where it was not subject to respondeat superior, then it certainly has greater exposure to liability if respondeat superior does apply, as it would in the instant case.

In the instant case, Murdick claims that Geffert's decision to terminate Murdick was based on Schulz's evaluations and recommendations, which were negative, and Murdick contends, were negative because he was a Buddhist. Therefore, Geffert's decision was ultimately based on Murdick's faith, though Geffert may not have even been aware of that. Murdick says that Geffert is simply a rubber stamp because Geffert's

decision to terminate Murdick was based on consultation with Schulz, and consultation with Kuemmel and Hulsey, who in turn formed their opinions based on Schulz's statements.  In effect, Murdick contends, Geffert's review of Schulz's decision was no review at all; it was based directly or indirectly almost entirely on Schulz's opinion. Geffert's reliance on Schulz's opinion of Murdick is even more pronounced when it is noted that the only other evidence the Court is aware that Geffert considered are Murdick's pre-Schulz reviews.  Even with the negative comments about Murdick's interpersonal skills, these reviews still rated him as "exceeds expectations," and by inference, apparently still an asset to the company, before Schulz became his supervisor.

The Court finds that Murdick has established that there is a genuine issue of material fact as to whether Geffert "rubber-stamped" Schulz's recommendation that Murdick be terminated.  Since this issue was not attacked in the motion for summary judgment, Murdick is still free to pursue other theories for intent under element three as well.

Regarding what occurrences constitute adverse employment actions, Catalina would limit the list solely to his termination.  Murdick's list includes: 1) termination; 2) an increase in his workload to the point where it was excessive and had shorter deadlines when compared to workloads of other employees; 3) assignment of duties beyond his job description; 4) denial of training and tools (i.e. a project manager) required for some of his assignments, which were available to other employees; 5) false performance reviews; and 6) placement on a PIP.

Catalina would have all these occurrences but the termination be lumped into the category of "everything that makes an employee unhappy," which would remove them from consideration because such occurrences are unprotected under Title VII.  *Davis v. Lake Park*, 245 F.3d 1232, 1242 (11th Cir. 2001).  In *Davis*, the Eleventh Circuit stated that in order for a party to prove an adverse employment action under this Title VII action, the party must show a "serious and material change in the terms, conditions, or privileges of employment."  *Id*. at 1239.  The court also said that the employee's subjective view is not controlling, but the "employment action must be materially adverse as viewed by a reasonable person under the circumstances."  *Id*. Catalina has properly supported its motion for summary judgment on this point.

Since the termination is uncontested, it will not be addressed, as it obviously qualifies.  Regarding the other changes, "because of the unique circumstances in each case, there is no complete list of adverse employment actions and the employment action does not have to result in a loss of pay or benefits for it to be a materially adverse employment action." *Fitch v. Continental Casualty Co.*, 2002 WL 31834877, at 4 (N.D. Ill. 2002).   Therefore, the other occurrences must be evaluated individually.

Regarding an excessive workload, the courts have been reluctant to hold that changes in job duties amount to adverse employment action when unaccompanied by any tangible harm.  *Davis,* 245 F.3d at 1244.  "Changes in assignments or work related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work-hour changes."  *Id.* citing, inter alia, *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886-887 (6th Cir. 1996). Neither party presents evidence of how Murdick's workload compared to others similarly situated, but Murdick states that in order to keep up with his workload he worked "excessive overtime" to complete them. Therefore, Murdick has shown that there is a genuine issue of material fact regarding whether his workload change was an adverse action, and this occurrence survives summary judgment as an adverse action.

Similarly, assignments outside his job description could constitute an adverse action on the same work-hour basis, which Murdick claims.  Catalina notes that Murdick said his job description didn't really apply, but Murdick said they applied generally to the department, but in practice he knew that each person in the department had a role that added up to the general description of duties in the job description.  Whether or not it violated the verbiage of the job description, Murdick contends that the changes violated the custom that had been established.  Had Murdick not claimed the change in the work-hours required, he would not be able to claim this as an adverse action, but he did. Therefore, Murdick has shown that there is a genuine issue of material fact regarding whether assignments beyond what was customary to that point was an adverse action, and this occurrence survives summary judgment as an adverse action.

Regarding Catalina not providing training to Murdick, an "adverse employment action" is any ultimate employment decision, such as a discharge "or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment,

deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Duffy v. Lowe's Home Centers, Inc.*, 414 F.Supp.2d 1133, (M.D.Fla. 2006).  Further, in *Harvey v. City of Bradenton*, Fla., 2005 WL 3533155, *5 (M.D.Fla. Dec.22, 2005)  this Court "rejected the plaintiff's argument that denial of training requests constituted an adverse employment action for purposes of his First-Amendment retaliation claim: "Plaintiff does not provide any legal support for the proposition that denial of training requests can constitute an adverse employment action. This conduct does not affect Plaintiff's salary, title, position, or job duties."  The Court went on to say that "[n]either does Plaintiff present any evidence that the training denied was an important condition of employment." *Id*.

Direct precedent on this point in this District appears to be lacking.  In *Harvey*, the court did not need to further address the issue because the missing training was not shown to be relevant.  *Id*.  In the instant case, Murdick indicates that the training and tools that Murdick claims were missing, though more detail would have been helpful. This Court has noted that a lack of follow through, proper filing of necessary paperwork, and project scheduling, etc. were observed as points of weakness in his job performance. This makes sense when taken together with the comments in his review that Murdick needed to see the big picture as his responsibilities increased.  Coincidently, those skills are the types of skills that a project manager, or project management training, would help with, and are what Murdick complains he was not given, when other employees were. By inference, this Court understands that the training he was apparently denied coincides with the weaknesses observed in his evaluations, which in turn played a substantial role in his termination.  The connection is not direct, but the Court will not rule out a lack of training as an adverse action yet because the Court is to view the evidence in a light favorable to the non-moving party, including taking inference when necessary. Therefore, Murdick has shown that there is a genuine issue of material fact regarding whether withheld training constitutes an adverse action, and this occurrence survives summary judgment as an adverse action.

Regarding Murdick's performance reviews, courts are "wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as loss in benefits, ineligibility for

promotional opportunities, or more formal discipline." *Davis*, 245 F.3d at 1241.  It is clear throughout the depositions that Murdick was placed on the PIP in large part due to his performance reviews.  Further, Geffert stated that he based his termination decision in part on the performance reviews, and he clearly gave weight to the reviews by Schulz over the more positive reviews.  These negative performance reviews can clearly be considered adverse actions, even if completely true, since they formed the basis of a more tangible adverse action.  Whether they are false goes more toward Schulz's intent than if they are adverse actions.  Murdick has shown that there is a genuine issue of material fact regarding whether the performance reviews were adverse actions, and therefore the reviews survive summary judgment as an adverse action.

Regarding placement on a PIP, Catalina cites *Fitch*, which held that the PIP was not an adverse employment action.  *Fitch*, 2002 WL 31834877 at 5.  In *Fitch*, however, the employee was placed on two separate PIPs, but neither impacted her job rating or salary, and, thus, the PIP itself was not an adverse action.  *Id*.  In the instant case, it is clear that Murdick's lack of compliance with the action items on the PIP, together with his failure to attend the semi-weekly PIP progress check meetings, together with his attitude during the meeting directly contributed to his termination.  Therefore, the PIP resulted in a more tangible adverse action, termination.  Murdick has shown that there is a genuine issue of material fact regarding whether the PIP was an adverse action, and, therefore, the PIP survives the motion for summary judgment as an adverse action.

This Court finds that Murdick's claimed occurrences can all constitute adverse employment actions, and, thus, they survive summary judgment.  Murdick had no burden to present evidence to show that there is a genuine issue of material fact regarding whether Geffert was aware that Murdick was a Buddhist.  Murdick had no burden to, but did show, that there is a genuine issue of material fact regarding whether Geffert "rubber-stamped" Schulz's recommendation. Finally, Murdick showed that there is a genuine issue of material fact regarding each of the six claimed adverse employment actions.  Therefore, Murdick survives Catalina's motion for summary judgment on the third element of the prima facie case.

Was someone outside Murdick's protected class treated differently?

Regarding the fourth and final element of a *prima facie* case, whether someone outside the protected class was treated differently, Catalina contends that Murdick has no "comparators," and without comparators, he cannot make out a prima facie case for discrimination. *Holifield*, 115 F.3d at 1561. Comparators are employees similarly situated to a party, who do not claim protected activity, and have not suffered discrimination. *Id*. They are used by a party to show that the discrimination, or disparate treatment, is motivated by the protected activity. *Id*. Murdick cites *Johnson v. Atlanta Independent School System*, which in turn cites *Holifield*, and says that if the plaintiff "fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*." *Johnson v. Atlanta Independent School System*, 137 Fed Appx. 311 (11th Cir. 2005) (citing *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997)) (emphasis added). Comparators are thus very helpful, but not a condition precedent for establishing a *prima facie* case for discrimination. Such a condition would be unreasonable as it would eliminate the possibility of Title VII claims in the myriad scenarios where no comparators exist. Since there is no absolute requirement that comparators be cited, Catalina has not properly supported its motion for summary judgment on this element, and Murdick has no burden to show a comparator.

The Court finds that Catalina has not properly supported its motion for summary judgment on the fourth element of the *prima facie* case, and, therefore, Murdick has no burden to provide comparators for Murdick to sustain an action. Murdick has survived each of Catalina's attacks under its motion for summary judgment regarding establishing a prima facie case. Therefore, the Court moves to the second step, where the burden shifts Catalina to articulate a legitimate, non-discriminatory reason for the adverse employment action.

*Non-Discriminatory Reason for the Adverse Employment Action*

If the defendant proffers a non-discriminatory reason for its action against the plaintiff, the presumption of discrimination is eliminated and the burden shifts again to the plaintiff to provide admissible evidence sufficient to permit a reasonable fact-finder

to conclude that the reasons given by the employer were pretext. *Burdine,* 450 U.S. at 255-56.  Catalina has proffered legitimate, non-discriminatory reasons for its actions against Murdick.  Catalina looks to its annual performance reviews that it claims demonstrate that Murdick had a history of poor work performance and attitude, going back to his first performance evaluation.  Catalina has properly supported its motion for summary judgment by providing a non-discriminatory reason for the adverse employment action.  Therefore, the Court moves to the third and final step, where the burden shifts back to Murdick, and Murdick has to show that the non-discriminatory reason was pretextual.

*Pretext*

Catalina has proffered a non-discriminatory reason for its actions against Murdick, so the burden shifts to Murdick to provide admissible evidence sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were pretext. *Burdine,* 450 U.S. at 255-56.

Catalina contends that Murdick cannot attack its non-discriminatory reason as pretext, because it was established by Murdick.  When asked if Murdick thought Catalina actually believed that Murdick deserved the criticism he received, Murdick said yes.  "An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). Catalina contends that if Murdick admits that Schulz believed in what he was doing, then Murdick's action cannot be sustained.

For some reason, Murdick does not address this point.  However, the Court notes that in Murdick's deposition, Murdick was not stating that he believed that he deserved the criticism, but that Catalina believed it.  The excerpt Catalina notes regards Murdick's response following the question of whether Schulz believed his criticism regarding Murdick's planning, documentation, and attitude.  Murdick does not contend that his attitude at that time could not have been improved, as he felt Catalina had been planning to let him go.  He contends that his attitude was not such a big factor before Schulz.  He also contends, by inference, that his planning and documentation suffered due to a lack of

proper tools, and training.  Later in his deposition Murdick states that  he does not believe Schulz is "stupid or ill-informed at all."  He stated that Schulz believes "a certain way, and his personal beliefs about what I feel, which he expressed, cloud his judgment on my work and what I do as a person."  (Dkt. No. 15, Exhibit E, p297).  When asked how he feels he was discriminated against, he said he was "discharged because a chain of events that Brad [Schulz] set in motion through inaccuracies that he perpetuated that would not – that I believe would not have happened if I was Christian."  (Dkt. No. 15, Exhibit E, p298).

The Court finds that Murdick has provided enough evidence to show that there is a genuine issue of material fact regarding the meaning of Murdick's testimony, and this point survives the motion for summary judgment.

Murdick offers additional information to show that the non-discriminatory reason was pretext.  First, Murdick refers to the performance reviews.  Again, each of the four available performance reviews pre-Schulz rated Murdick's job performance as "exceeds expectations," while the Schulz reviews drop to "meets expectations," and then "below expectations."  Also, in individual categories, only 3% of his categories pre-Schulz did not meet expectations, while on his final performance review by Schulz, 67% of the categories did not meet expectations, after only two years.  This Court recognizes that this is not proof of discriminative intent, but it does provide enough information to show that there is a genuine issue of material fact regarding whether the non-discriminatory reason given is pretext.

The only evidence Catalina provides that Schulz was not aware of Murdick's faith is Schulz's word, but Murdick subsequently presented pictures where Schulz was so close to Murdick while Murdick was practicing Buddhist rituals at a Buddhist temple that it would be challenging for Schulz to deny such knowledge.  Murdick has presented evidence that could be interpreted as impeaching Schulz's testimony, which again creates a genuine issue of material fact as to whether Schulz's statements about his motivations are pretext.

Murdick points out that in the pre-Schulz reviews, job performance, attitude, and refusal to take responsibility were never mentioned directly as problems.  Murdick does not dispute that his interpersonal skills have always been an area of weakness.   He does

contend, however, that his reviews by Schulz mention new areas of weakness that were never a problem before Schulz became his supervisor.  Whether the addition of these areas of weakness establish pretext, or a means by which a discriminatory intent can be enabled, is a genuine issue of material fact for a jury to determine.

Finally, Murdick has presented enough evidence to establish a genuine issue of material fact as to whether Geffert "rubber-stamped" Schulz's recommendation, which would protect Murdick's membership in the protected class.

This Court finds that Murdick has satisfactorily presented enough evidence to survive a motion for summary judgment regarding whether Catalina's non-discriminatory reason offered for Murdick's adverse actions was pretext.

## CONCLUSION

Defendant's Motion to Strike plaintiff's photographs included in exhibit "O" is **DENIED**, without prejudice.  However, plaintiff is permitted to use the photographs for impeachment purposes only.  Defendant's Motion to Strike plaintiff's affidavit included as exhibit "P" is **GRANTED**.

Murdick has presented enough evidence to create a genuine issue of material fact regarding each element required to establish a *prima facie* case of employment discrimination under Title VII.  Murdick has also presented enough evidence to create a genuine issue of material fact regarding whether the non-discriminatory reason given by Catalina for the adverse employment actions is pretext.  Therefore, Murdick survives Catalina's motion for summary judgment on the Title VII claim.  Since the decision regarding the Title VII claim dictates the decision regarding the Florida Civil Rights Act of 1992 claim,  Defendant's Motion for Summary Judgment is **DENIED**. Accordingly, it is

**ORDERED** Defendant's Motion to Strike Plaintiff's Affidavits Filed in Opposition to Motion for Summary Judgment (Docket No. 17) is hereby **DENIED** as to Exhibit "O," and **GRANTED** as to Exhibit "P."  Defendant's Motion for Summary Judgment (Docket No. 9) is hereby **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 11th day of July, 2006.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Cc: All Parties and Counsel of Record